Filed 6/25/13  Marriage of Mesbah CA4/3

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Marriage of SOUZAN  and SHAWN MESBAH. | |
| SOUZAN MESBAH, | G046361 |
| Respondent, | (Super. Ct. No. 01D007391) |
| v. | O P I N I O N |
| SHAWN MESBAH, | |
| Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Robert H. Gallivan, Judge.  (Retired judge of the Orange Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Shawn Mesbah, in pro. per., for Appellant.

Farah F. Azar for Respondent.

*          *          *

This is a child and spousal support arrearages case. Substantial evidence supports the trial court's determination appellant Shawn Mesbah owes his ex-wife Souzan Mesbah[1] $107,315 in unpaid support, so we affirm the court's order.[2]

BACKGROUND

We emphasize at the outset that the record provided this court by appellant Shawn is incomplete. In particular, the clerk's transcript, which usually contains the documents in the file which bore on the decision of the trial court being appealed, contains almost nothing. It does not include, for example, the marital settlement agreement which was the underlying basis for the order to show cause (OSC) brought by Souzan in this case, nor does it contain the OSC itself. In fact, the only item of substance it does contain is the minute order, entered August 3, 2011, from which Shawn has appealed.[3] We therefore take judicial notice of two documents from the trial court's file

---

[1] At trial Souzan Mesbah went by the name of Souzan Azar. In this opinion we will refer to the parties by their first names, in part because that is now the custom in family law appellate jurisprudence, and in part to avoid confusion with Souzan's trial (and also appellate) counsel, who is also named Azar. (In fact, at one point in the proceedings, Souzan's own trial attorney called Souzan "Ms. Mesbah" instead of "Ms. Azar" because she was "so used to calling" Souzan Ms. Mesbah.) (*In re Marriage of Balcof* (2006) 141 Cal.App.4th 1509, 1513, fn. 2.)

[2] About $40,000 of the $107,315 is interest. The disparity between the legal interest rate of 10 percent and general market interest rates (which have been much lower over the course of the last decade) creates its own potential for "harsh," and arguably inequitable results, a point noted by this court in *In re Marriage of Cordero* (2002) 95 Cal.App.4th 653, 658 ["in the area of spousal support collection, the disparity creates the potential for harsh inequity"].) But even given the "harsh" effects of 10 percent legal interest, it is still the law and it is up to the Legislature to make any changes. One thing the high rate of legal interest does do, of course, is create a big incentive for payor ex-spouses (like Shawn) to stay on top of their support obligations. (See *id.* at p. 658 ["After all, the law wants to encourage judgment debtors to satisfy judgments . . . ."].)

[3] The notice of appeal doesn't even *specify* that order. Rather, the notice of appeal only specifies a "judgment after court trial" without a date. Normally, any such "judgment" would be the one ending the marriage of the parties, in this case the one entered in 2002, and we would be forced to summarily dismiss Shawn's appeal as taken from the wrong decision of the trial court. Rules of liberal construction of notices of appeal cannot save challenges to orders and judgments not specified in the notice of appeal. (See *Conservatorship of Edde* (2009) 173 Cal.App.4th 883, 889; *Morton v. Wagner* (2007) 156 Cal.App.4th 963, 967.)

However – to the great credit of the clerks involved – a deputy appellate clerk at the superior court noticed that Shawn's notice of appeal was incomplete (no date was specified) and asked Shawn for the information. Shawn telephoned her later from out of the country to tell her it was the minute order of August 30, 2011, which he meant to appeal from. That clerk then relayed the information to a clerk of this court.

There is, strictly speaking, no minute order dated August 30, 2011 in the superior court file at all. But the numerical transposition is obvious: 30 should be 03. Therefore, under the rule of liberal construction of notices of appeal, we deem the appeal to be from the August 3, 2011 minute order, which does indeed contain the order requiring Shawn to pay $107,315. We note in this regard that Souzan has not been prejudiced in any way. Her brief shows she always understood the appeal to be from that minute order.

(the couple's marital settlement agreement filed in 2002, and Souzan's motion to determine arrearages filed in 2010), plus two documents from our own file (the civil case information statement filed by Shawn which contains the "Xspouse" printout used by the trial court to calculate the arrearages, plus our clerk's docket entries) to begin to make sense of Shawn's appeal. That said, in broad overview, the facts are as follows:

Souzan and Shawn were divorced in May 2002. Their marital settlement agreement provided Shawn would pay Souzan $2,000 a month, consisting of $646 times two for each of the couple's two children (Kourosh, then about 11 and Shahrzad, then about 9), plus another $708 a month in spousal support to Souzan. Shawn got the family house in Mission Viejo as his separate property.

But it was not a conventional divorce. By the beginning of 2003 Souzan had moved back in to the Mission Viejo house that was now Shawn's separate property.

The parties told different stories to the trial court as to the reason for Souzan's moving back. According to Souzan, the move back was in hope of a possible reconciliation. According to Shawn, it was because Souzan and the kids "begged" him to come back. (Souzan had been paying $1,700 a month to rent elsewhere.) In any event, there is no dispute that Souzan and the two children *did*, in fact, return to the house around January 2003.

Nor is there any dispute that, in the period January 2003 through August 2008, Shawn was out of the country "most" of the time. Souzan testified that Shawn was in Iran "most of the time," while Shawn himself acknowledged he was out of the United States about 10 months a year in the 2003-2008.

At the beginning of the move-back period, Shawn and Souzan signed a written document, entitled "promissory note," the nature of which is one of the key points in Shawn's appeal. The occasion was a loan of money from Souzan to Shawn, hence the "promissory note" denomination. The document consists of two sentences of type-written material, followed by handwritten material following the second sentence.

The typewritten material is: "I, Shawn Mesbah have received $10,000 from Souzan Azar in February of 2002 and would repay the principle amount plus simple interest with the rate of 5% [¶] Additionally, it is agreed that Souzan Azar will pay $1,000 per month for rent."

There is a handwritten interlineation changing the year 2002 to 2003. This interlineation tallies with the idea that Souzan moved back into the house in January 2003.

But there is another handwritten interlineation of more substance. After the typed words "for rent," there is this handwritten material: "& food, etc. and live with the kids in the house *in lieu of* spousal & child support & I pay for all expenses." (Italics added.)

There was no dispute before the trial court that the document was signed by both Shawn and Souzan, but there was a big dispute as to whether Souzan signed off on the handwritten "in lieu of spousal & child support" language.

According to Souzan, the "in lieu of" language was an "alteration," added *after* she signed the document, to which she never agreed. According to Shawn, Souzan signed it *with* the added, handwritten language. However, even Shawn acknowledged that no less than three different colors of red ink appear on the document.

Whatever the provenance of the handwritten material on the document, it is safe to say that Shawn generally ceased writing checks to Souzan expressly called spousal and child support from January 2003 through July 2008.[4] Rather, Shawn felt that it was enough he was allowing Souzan and the children to reside in his separate property home during that period. As his appellant's brief makes clear, Shawn believed that by affording Souzan and the children a house with a fair rental value of $3,500 a month, plus making his personal checking account available to Souzan to pay expenses, he was more

_____

[4]    In his opening brief Shawn does not identify any payments for which he did not receive credit in the court's eventual $107,135 order.

4

than fulfilling his spousal and child support obligations of $2,000 a month. We note also that Souzan's spousal support terminated at the end of 2006, so a fair rental value of $3,500 would easily exceed the remaining child support of $1,292 a month. Further, it is also true that, when Souzan and the children moved out around August 2008, the house was actually rented out for $3,500 a month.

For her part, Souzan ceased paying the $1,000 rent when Shawn ceased paying formal support. The ultimate $107,135 figure determined by the trial court *does* include $1,000 a month offsets to Shawn for the rent.

About two years after the August move-out, Souzan brought an OSC to determine arrearages based on Shawn's nonpayment of the ordered $2,000 (after 2006, $1,292) monetary support for the period 2002 through 2008. The trial court, after a mistrial in January 2011 because of too-short time estimates, eventually completed a hearing on Souzan's OSC in early August 2011. That hearing resulted in the order Shawn pay $107,315 which is the subject of this appeal.

DISCUSSION

Preliminarily, we must remind Shawn that while he has the right to represent himself on appeal, he is held to the same standards as an attorney. (*Rappleyea v. Campbell* (1994) 8 Cal.4th 975, 985 [giving self-represented parties "exceptional treatment" is unfair to other parties]; *Kobayashi v. Superior Court* (2009) 175 Cal.App.4th 536, 543 ["Pro. per. litigants are held to the same standards as attorneys."].) Those standards include the requirement appellate briefs present statements of facts with record references. (See Cal. Rules of Court, rule 8.204(a)(1)(C); see also Eisenberg, et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2012) ¶ 9:37, pp. 9-13 to 9-14.)

Shawn, however, has utterly failed to comply with the record reference requirement. By doing so, he has, in effect, conferred on this court the discretionary power to ignore his arguments and, were we to exercise that power, we could end this

5

opinion right here. Shawn would lose without consideration of any of his arguments. (See *Haley v. Casa Del Rey Homeowners Ass'n*. (2007) 153 Cal.App.4th 863, 871 ["where a party provides a brief 'without argument, citation of authority or record references establishing that the points were made below,' we may "'treat the points as waived, or meritless, and pass them without further consideration'"].) However, we exercise our discretion to consider the merits of Shawn's appeal, bearing in mind that many middle income people are simply unable to afford attorneys, and are often thrown back on their own devices. (See *Cordero, supra*, 95 Cal.App.4th at p. 659.)

With one big exception. And on that exception we will hold Shawn strictly to the rule that facts be supported with record references. The exception involves his first argument, namely that Souzan received "many cash payments and benefits as evidenced by checks she had received." Shawn's point is that the trial court erred in not having credited those "many cash payments" against his mounting support arrearage.

Shawn may have a valid point here as to at least a few checks, but his mishandling of his own appeal precludes our consideration of them. Souzan filed her respondent's brief on October 18, 2012. About 13 days *after* that, on October 31, Shawn filed a motion to augment the record and produce additional evidence on appeal. This court granted the *augmentation* request on December 20, 2012, and deemed the documents attached to the motion "part of the record on appeal," because Souzan did not file any opposition to the motion. However, the order granting the augmentation request said nothing about the request to take "additional evidence." Two of the exhibits which Shawn included in his motion to augment, exhibits "J" and "K," appear to show that Shawn indeed paid, via checks written on his account (signed either by Shawn himself or by Souzan, who had access to his checkbook), at least some sums of money that appear to constitute substantive child support. For example, exhibit "J" references a check directly given to the couple's son Kourosh in November 2005, another check for "Kid School" of

6

$200 made out in September 2006, and a $125 check for Kourosh's karate lessons in May 2004. Exhibit "K" likewise references checks for "Kids School," and karate lessons.[5]

To the degree that Shawn's motion to augment, filed after Souzan's respondent's brief, shows payments from his checking account for which he arguably should have received credit for child or spousal support, we will not take those payments into account. To do so would be utterly unfair to Souzan. Shawn did not refer to any of the exhibits in his augmentation motion in his appellant's opening brief. Souzan has therefore had no chance at all to address any arguments based on those exhibits. (See, e.g., *Smith v. Adventist Health System/West* (2010) 182 Cal.App.4th 729, 748-749 [declining to address issue that could have been raised earlier because so addressing the issue on appeal "would encourage 'sandbagging'"].)

Besides the unfairness to Souzan, considering those payments would also be inconsistent with our role as an *appellate* court. Generally speaking, we review the record as it was before the trial court, we do not look at evidence anew. (See *In re Zeth S.* (2003) 31 Cal.4th 396, 405 ["It has long been the general rule and understanding that 'an appeal reviews the correctness of a judgment as of the time of its rendition, upon a record of matters which were before the trial court for its consideration.'"].) The possibility of taking additional evidence on appeal under section 909 of the Code of Civil Procedure is limited *necessarily* to postjudgment events such as the case becoming moot (e.g., *Millbrae Assn. for Residential Survival v. City of Millbrae* (1968) 262 Cal.App.2d 222, 232 ["this court has power to take such additional evidence . . . and should dismiss an appeal when such evidence shows that events occurring after judgment have rendered the appeal moot"]) *or* to *affirm* a judgment, not reverse it. (Eisenberg, et al., Cal. Practice

---

[5] We should note here, for sake of completeness though, that while a few checks here and there do seem to be genuine child support, *many* of the items listed in exhibits "J" and "K" are those which would be naturally be paid by a landlord, such as mortgage payments. Other items *might* be paid by a landlord, such as utility bills.

Guide:  Civil Appeals and Writs, supra, [¶] 5:169, p. 5-63 ["As a basic principle of appellate review, the proffered new evidence must enable the appellate court to *affirm* the judgment, not lead to reversal  . . . ."].)  The power to take additional evidence is *not* a power to "usurp" the trial court's role as fact-finder.  (*Ibid*.)

Here, Shawn's exhibits "J" and "K" do not appear to have been submitted to the trial court.  Neither corresponds to the exhibits "J" and "K" which he offered at trial.[6]  The bottom line is that as far as his first argument is concerned, Shawn is stuck with what he wrote in his appellant's opening brief and the record supporting that brief, which does not include exhibits "J" and "K."

And in his appellant's opening brief, Shawn makes no attempt to identify any evidence of the "cash" payments he made, or make any argument how those checks necessarily would constitute either child or spousal support for which he should have received credit.  He has thus failed to carry his burden of showing some error or abuse of discretion on the trial court's part. (See *Kurinij v. Hanna & Morton* (1997) 55 Cal.App.4th 853, 865 [an appellant must "present argument and authorities on each point to which error is asserted, or else the issue is waived"].)

We now turn to his other arguments, which are not colored by the problem of new evidence on appeal.  Shawn's second argument is that there is no substantial evidence that Souzan ever actually demanded any support payments.  The implication of this argument is that a demand was *necessary* before any support obligation would accrue.

On this one, Shawn is both in factual and legal error.  Factually, there *was* substantial evidence that Souzan did demand her support payments.  She testified so, and the testimony can be found on page 247 of the reporter's transcript.  Such testimony is enough. (See *In re Marriage of Howell* (2011) 195 Cal.App.4th 1062, 1079, quoting

---

[6]     Shawn's exhibit "J" at trial was some sort of communication from Souzan to him.  Shawn's exhibit "K" was a "demand for money" from Souzan.)

8

*Fariba v. Dealer Services Corp.* (2009) 178 Cal.App.4th 156, 170-171 ["'Credibility is an issue of fact for the trier of fact to resolve . . ., and the testimony of a single witness, even a party, is sufficient to provide substantial evidence to support a factual finding'"].)

And legally, Souzan wasn't under any obligation to demand support payments. The judgment entered back in 2002, incorporating the marital settlement agreement, provided for monthly support payments of $2,000, and the law treats each monthly support payment as its own individual judgment when each installment comes due. (*Cordero, supra*, 95 Cal.App.4th at pp. 657-658.) Souzan's supposed silence could not estop her from being able to collect even spousal support, much less child support. (See Fam. Code, § 4502 [judgment "for child, family, or spousal support . . . including all lawful interest and penalties computed thereon, is enforceable until paid in full"]; *Cordero, supra*, 95 Cal.App.4th at pp. 659-665 [in opinion broadly sympathetic to payor spouse in spousal support case, reluctantly concluding laches defense was not available]; *Jackson v. Jackson* (1975) 51 Cal.App.3d 363, 366 ["it is true . . . that accrued arrearages are treated like a judgment for money"]; *In re Marriage of Dancy* (2000) 82 Cal.App.4th 1142, 1166 (conc. opn. of Ramirez, P.J.) ["The noncustodial parent has an obligation to pay child support regardless of whether the custodial parent actively seeks it."].)

We will treat Shawn's fourth argument out of order because it is a variation of his second argument. He claims Souzan's silence plus claiming the children as dependents on her tax returns somehow establishes that Souzan agreed to the "in lieu of" language in the promissory note.

This argument fails for the same reason the last one did: There was substantial evidence Souzan wasn't silent, even though she had every right to be. And the supportive point Shawn attempts to make about Souzan's tax returns is a non sequitur. Shawn asserts that by claiming the children as dependents on her tax returns, Souzan somehow agreed to the "in lieu of" language. But there is no logical connection.

9

Either way, one would expect Souzan to have claimed the children as dependents: Absent a waiver, under federal law, it is the *custodial* parent who receives the dependency deduction. (See Int.Rev. Code, § 152; see generally *Monterey County v. Cornejo* (1991) 53 Cal.3d 1271, 1278 [observing federal tax law placed "the dependency exemption in the custodial parent unless a waiver is executed"].)

Which brings us back to Shawn's third argument. That is the core of his grievance with the trial court's order. He argues that because the house was rented out for $3,500 a month when Souzan and the children vacated the premises, she and the children necessarily received a support benefit far in excess of the $2,000 (after Souzan's spousal support terminated at the end of 2006, $1,292 a month). Here, Shawn's argument runs afoul of the evidence at the hearing that Souzan never signed the handwritten portion of the promissory note, thus she never agreed to accept the "in lieu of" language. Given that evidence, the trial court could reasonably assume the parties had agreed to a rental value of $1,000 a month, so that Shawn still had some support money to pay.

We may observe in this connection that Shawn's own explanation as to why three different kinds of red ink should appear on the document is, to be charitable, hard to follow. And, the trial judge, as trier of fact, expressly found Shawn not to be credible.[7] On appeal, therefore, we have no choice but to accept the version of events told by Souzan: Shawn simply altered the document after she signed it. (*In re Margarita D.* (1999) 72 Cal.App.4th 1288, 1295-1296 ["The court, which had the opportunity to observe the witnesses testify, is better suited than a reviewing court to make such determinations of fact."].)

---

[7] Toward the end of the hearing, the judge turned to Shawn and said: "The court frankly, Mr. Mesbah, has found that your testimony not to be credible. And the court feels that the note, your assertions that the petitioner agreed to the language that's been written in about food, et cetera, and lived with the kids in the house in lieu of support, I find that not credible tentatively. Maybe counsel's argument can convince me that I'm missing something." As the subsequent order showed, counsel didn't change the trial judge's mind.

10

Shawn's fifth and final argument is a variation on his second (no demand) and fourth (silence) arguments. Basically, he says that Souzan's "adherence" to the "in lieu of" language shows she necessarily must have agreed to it. This argument fails for the same reasons the second and fourth arguments do: Souzan *didn't* adhere to the "in lieu of" language. She testified she actually demanded support. And, further, as we have shown, she didn't even have to do that in order for the support obligation to continue to mount up. We also observe that given the uncontroverted testimony Shawn was out of the country "most" of the time for the period in question, the case is even stronger than *Jackson, supra*, 51 Cal.App.3d 363, a case where a payor parent was given the possibility of receiving credit against a mounting child support obligation. The key point about *Jackson* is that, despite the fact the child support payments were to go from father to mother, the daughter went to live with her father "shortly" after the divorce. It was the father who was the de facto custodial parent. In this case, by contrast, the children weren't really living with Shawn, but with Souzan. Shawn was gone, after all, about 10 months of the year.

For her part, in her respondent's brief, Souzan asks this court to award sanctions against Shawn for having filed a frivolous appeal. We do not grant her request because a separate motion filed in conformity with California Rules of Court, rule 8.276, is necessary. Likewise, we deny Souzan's request for the imposition of a bond, also made in her respondent's brief. It is not our role as a court to give her legal advice as to how to go about trying to enforce the trial court's order.

11

DISPOSITION

The order of August 3, 2011, is affirmed.  Souzan will recover her costs on appeal.

BEDSWORTH, J.

WE CONCUR:

RYLAARSDAM, ACTING P. J.

MOORE, J.

12